UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

_____

ROBERT TOBACK, on behalf of himself : Civil Action No.
and all others similarly situated, :
:
               Plaintiff, : CLASS ACTION
:
  -against- : JURY TRIAL DEMANDED
:
GNC HOLDINGS, INC., GNC :
CORPORATION, GENERAL NUTRITION :
CORPORATION and GENERAL NUTRITION :
CENTERS, INC., :
:
               Defendants. :
_____:

## COMPLAINT

Plaintiff Robert Toback, by and through his counsel, Denlea & Carton LLP and Criden & Love, P.A., respectfully files this Class Action Complaint on behalf of himself and a class of similarly-situated individuals in Florida who have purchased a TriFlex joint care product manufactured and/or marketed by Defendants GNC Holdings, Inc., GNC Corporation, General Nutrition Corporation and General Nutrition Centers, Inc. (collectively, "GNC"), and alleges as follows:

## PARTIES

1. Plaintiff Robert Toback ("Toback") is a natural person of full age of majority who is domiciled and residing in Delray Beach, Florida.

2. Defendant GNC Holdings, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 300 Sixth

Avenue, Pittsburgh, Pennsylvania. GNC Holdings is a holding company which conducts all its operations through its wholly-owned and indirectly-owned subsidiaries, including GNC Corporation, and its operating subsidiary, General Nutrition Centers, Inc.

3. Defendant GNC Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 300 Sixth Avenue, Pittsburgh, Pennsylvania. GNC Corporation, through its subsidiaries, operates as a specialty retailer of health and wellness products worldwide.

4. Defendant General Nutrition Corporation is a Pennsylvania corporation with its principal place of business located at 300 Sixth Avenue, Pittsburgh, Pennsylvania.

5. Defendant General Nutrition Centers, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 300 Sixth Avenue, Pittsburgh, Pennsylvania. Defendant General Nutrition Centers, Inc. is GNC's operating subsidiary.

6. GNC claims to be the leading global specialty retailer of health and wellness products, including vitamins, minerals and herbal supplement products, sports nutrition products, and diet products. GNC's diversified, multi-channel business model derives revenue from product sales through company-owned domestic retail stores, domestic and international franchise activities, third-party contract manufacturing, e-commerce and corporate partnerships.

7. GNC believes that its products constitute a highly-valued and iconic brand. GNC maintains a broad global footprint of more than 8,100 locations in the United States and in 54 international countries (including distribution centers where retail sales are made) and on GNC.com, its online website. GNC has a presence in all 50 states and in the District of Columbia. GNC's network of domestic retail locations is approximately 11 times larger than the next U.S. specialty retailer of nutritional supplements.

8. As of December 31, 2012, GNC operated 3,188 company-owned stores across all 50 states, the District of Columbia, Canada, and Puerto Rico. As of that date, there were 2,779 GNC franchise stores operating, including 949 franchise stores in the United States and 1,830 international franchise stores operating in 54 countries. Both the company-owned stores and the franchise stores stock and sell GNC's proprietary products which GNC manufactures at its two main manufacturing facilities in South Carolina.

9. As of December 31, 2012, GNC operated 247 company-owned retail stores in the State of Florida along with 89 GNC franchise stores. Moreover, GNC sold substantial quantities of products delivered to customers in the State of Florida who purchased those products using GNC.com, GNC's Internet sales website.

10. For the year ended December 31, 2012, GNC's total U.S. retail revenues amounted to $1.609 billion. In GNC's VMHS product category, which includes

3

Vitamins, Minerals, and Herbal Supplement products, GNC's revenues for 2012 were $624.6 million.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). Jurisdiction is proper because (1) the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interests and costs and (2) the named Plaintiff and the Defendants are citizens of different states. 28 U.S.C. §1332(d)(2)(A).

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial part of the events giving rise to the claim occurred within this judicial district and because Defendants have marketed and sold the products at issue in this action within this judicial district and have done business within this judicial district.

## CHOICE OF LAW

13.     Florida law governs the state law claims asserted herein by Plaintiff and the class members.

14.     Defendants' acts and omissions described herein were implemented in the State of Florida through Defendants' marketing and sales of their products within the State of Florida.

15.     Florida has a substantial interest in protecting the rights and interests of Florida residents and others who purchase goods in Florida against wrongdoing by companies which market and distribute their products within the State of Florida, which interest is greater

4

than that of any other State or country.

## GENERAL ALLEGATIONS

16.     GNC manufactures and sells a wide variety of vitamin, mineral, nutritional and dietary supplement products.

17.     One of GNC's most successful products is a line of dietary supplements sold under the trademarked name TriFlex. The TriFlex product line is a line of products most of which contain, among other contents, glucosamine and/or chondroitin. The TriFlex products are sold nationwide in GNC's company-owned stores, GNC's franchise stores, online at Amazon.com and on other websites, including GNC's GNC.com and drugstore.com, warehouse clubs and mass merchandisers, including Sam's Club. A very substantial amount of sales of the TriFlex products are made in Florida.

18.     GNC extensively advertises the TriFlex product line in consumer and trade media with national distribution, and also on the GNC website (http://www.GNC.com).

19.     Millions of adults in the United States live with arthritis, a disease involving the breakdown of cartilage in joints, or other orthopedic disorders in which cartilage in joints is broken down over time and causes bones in those joints to grind against each other. Cartilage normally protects a joint, allowing it to move smoothly, and also absorbs shock when pressure is placed on the joint. Without normal amounts of cartilage, the bones in the joint rub together, causing pain, swelling, and stiffness. These conditions are often extremely painful and result in limitations on motion, and most often impact elderly persons.

20. In response to the desperation of consumers suffering from painful and debilitating arthritic and other orthopedic conditions, dietary supplement manufacturers have rolled out a variety of products promising relief from chronic pain. Manufacturers pushing for more market share have not been content to advertise pain relief, and have been making more and more outlandish promises to consumers, including promises that supplements can promote joint health and mobility through structural changes to joints, and that their supplements can actually repair, regenerate, maintain, preserve, renew, or rebuild cartilage.

21. GNC is one such manufacturer. GNC manufactures, markets, and sells the TriFlex products, most of which contain glucosamine hydrochloride and/or chondroitin sulfate.

22. Glucosamine is an amino sugar that the body distributes in cartilage. Glucosamine is produced commercially from crustacean exoskeletons, and is one of the most common, non-vitamin dietary supplements sold in the United States.

23. Chondroitin is a sulfated glycosaminoglygan composed of a chain of alternating sugars. Chondroitin sulfate is a structural component of cartilage and provides resistance to compression.

24. None of these ingredients will help build, rebuild, regenerate, repair, or renew cartilage or repair damage to joints.

25. Nonetheless, GNC promotes that the TriFlex products will help rebuild or regenerate cartilage. The packages that the TriFlex products are sold in contain, in a boxed section of the packaging and also in a textual section of the packaging, the statement that the

6

products help rebuild or regenerate cartilage. For example, the package that "TriFlex Complete Vitapak" comes in actually states on the front of the box the claim "Rebuilds cartilage and lubricates joints." The TriFlex Complete Vitapak label states in bold bullets: "Comprehensive Vitapak program that supports Improved joint health with TriFlex Fast-Acting, Triple Strength Fish Oil, White Willow Bark and MSM….Rebuilds cartilage and lubricates joints." More detailed text on the side of the box reads: "GNC TriFlex Vitapak features clinically studied ingredients that support total joint health and provide joint comfort in as early as two weeks. These ingredients support mobility and flexibility, rebuild cartilage and lubricate joints. TriFlex Fast-Acting – This maximum strength, fast-acting comfort formula features the full potency, clinically studied doses of glucosamine and chondroitin to support joint comfort and flexibility. Glucosamine and chondroitin help preserve joint function and rebuild cartilage. It combines two important structural components of joint cartilage, MSM and hyaluronic acid (HA) which helps with cushioning joints and maintains the elastic integrity of skin. It also includes 30 mg of vitamin C. Vitamin C is involved in the synthesis of collagen." The listing for this product on the GNC.com website provides the identical description of TriFlex Vitapak. The box contains 30 packs and has a list sales price of $49.99.

26.     Defendants' GNC TriFlex Soft Chewables – a bag of 60 soft chews containing glucosamine, chondroitin and MSM, and available in either chocolate or peanut butter flavors – states on the front of the bag: "GNC TriFlex Soft Chews Dietary Supplement." Below that language, on the left side of the front of the package, Defendants state: "Promotes joint mobility and flexibility – Helps rebuild cartilage."

27.     The box containing GNC TriFlex Fast-Acting caplets (120 caplets), which lists

7

for $36.99, states that with respect to glucosamine and chondroitin, which are components of the caplets: "Glucosamine and Chondroitin are natural building block components found in connective tissues and joint cartilage. Scientific research has shown that these building block compounds help to support the body's natural ability to regenerate cartilage and lubricate joints thus supporting joint health integrity and function."

28. Other GNC TriFlex products make similar false and misleading claims that they rebuild or regenerate cartilage. The statements that the TriFlex products rebuild or regenerate cartilage are false and misleading because there is no scientifically sound study demonstrating that the TriFlex products can help repair, regenerate, maintain, preserve, or rebuild cartilage. The statement that the TriFlex products rebuild or regenerate cartilage are untrue.

29. There is no study or literature even suggesting that glucosamine or chondroitin can repair, regenerate, rebuild, maintain, preserve, renew, or rejuvenate cartilage, or rebuild joints, as numerous studies on the topic have confirmed:

- In February 2006, the New England Journal of Medicine published a report on a double blind study addressing in part the efficacy of ingesting glucosamine hydrochloride 1500mg. Clegg, et al., "Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee Osteoarthritis," New Eng. J. Med. 354:795-808 (Feb. 2006). The study concluded that there was no showing that the supplement was effective in treating osteoarthritis.

- In February 2008, the Annals of Internal Medicine published a

8

study entitled, "Effect of Glucosamine Sulfate on Hip Osteoarthritis: a Randomized Trial," Annals of Internal Medicine 2008 Feb 19; 148(4): 268-277. The article published the results of a study which examined whether glucosamine sulfate has an effect on the symptoms and structural progression of hip osteoarthritis during two years of treatment; the conclusion reached from the study was that glucosamine sulfate was no better than a placebo in reducing the symptoms and progression of hip osteoarthritis.

- In October 2008, the American College of Rheumatology's Journal, Arthritis & Rheumatism, published a report on a double blind study conducted at multiple centers in the United States examining joint space width loss with radiograph films in patients who were treated with glucosamine hydrochloride and/or chondroitin sulfate, alone or in combination. The authors concluded that after two years of treatment with these supplements, the treatment did not demonstrate a clinically important difference in joint space width loss. Sawitzke et al., "The Effect of Glucosamine and/or Chondroitin Sulfate on the Progression of Knee Osteoarthritis, A Report from the Glucosamine/Chondroitin Arthritis Intervention Trial," Arthritis Rheum. 58:3183-3191 (2008).

- In March 2009, Harvard Medical School published a study conclusively proving that the ingestion of glucosamine could not affect

9

the growth of cartilage. The study took note of the foregoing 2006 and 2008 studies, which "cast considerable doubt" upon the value of glucosamine. The authors went on to conduct an independent study of subjects ingesting 1500 mg of glucosamine, and proved that only trace amounts of glucosamine entered the human serum, far below any amount that could possibly affect cartilage. Moreover, even those trace amounts were present only for a few hours after ingestion. The authors noted that a 1986 study had found no glucosamine in human plasma after ingestion of four times the usual 1500 mg of glucosamine chloride or sulphate. Silbert, "Dietary Glucosamine Under Question," Glycobiology 19(6):564-567 (2009).

• In April 2009, the Journal of Orthopaedic Surgery published an article entitled, "Review Article: Glucosamine." The article's authors concluded that, based on their literature review, there was "little or no evidence" to suggest that glucosamine was superior to a placebo even in slowing down cartilage deterioration, much less rebuilding it. Kirkham, et al., Review Article: Glucosamine, Journal of Orthopaedic Surgery, 17(1): 72-6 (2009).

• In August 2010, the Annals of the Rheumatic Diseases published an article entitled, "Clinical Efficacy and Safety Over Two Years Use of Glucosamine, Chondroitin Sulfate, their Combination, Celecoxib or

Placebo Taken to Treat Osteoarthritis of the Knee: a GAIT Report." Sawitzke, et al., Ann Rheum Dis. 2010 August 69(8): 1459-1464. Participants received either glucosamine alone, chondroitin sulfate alone, a combination of glucosamine and chondroitin sulfate, Celecoxib, or a placebo three times daily over twenty-four months. The article's authors concluded that over two years, no treatment achieved a clinically important difference in pain or function as compared with the placebo.

30. To date, there are only two studies purporting to claim that the ingestion of glucosamine can affect the growth or deterioration of cartilage, both sponsored by a glucosamine supplement manufacturer: Pavelka, et al., "Glucosamine Sulfate Use and Delay of Progression of Knee Osteoarthritis," Arch. Intern. Med., 162: 2113-2123 (2002); Reginster et al., "Long-term Effects of Glucosamine Sulphate On Osteoarthritis Progress: A Randomised, Placebo-Controlled Clinical Trial," Lancet, 357: 251-6 (2001). As noted in the April 2009 Journal of Orthopaedic Surgery article, the methodologies in those studies had "inherently poor reproducibility," and even minor changes in posture by the subjects during scans could cause false apparent changes in cartilage. The authors of the Journal of Orthopaedic Surgery article explained the manufacturer-sponsored studies' findings by noting that "industry-sponsored trials report positive effects more often than do non-sponsored trials and more find pro-industry results."

31. There is no study that supports the claim that glucosamine and/or chondroitin, either alone or in combination, will repair, regenerate, maintain, preserve, restore, rebuild,

11

renew or rejuvenate joint cartilage that has broken down or worn away.

32. Defendants sell their TriFlex line of products in the United States as a dietary supplement in the United States. The TriFlex products are not regulated as a drug.

33. Defendants sell their TriFlex line of products without any competent and reliable scientific evidence that glucosamine and/or chondroitin will help to repair, maintain, regenerate, preserve, renew, or rebuild cartilage. At no time have Defendants had any competent, reliable or scientific evidence to support their claims that their TriFlex line of products will help repair, regenerate, maintain, preserve, renew, or rebuild cartilage. Defendants lacked a reasonable basis to represent to consumers that their TriFlex products repair, regenerate, maintain, preserve, renew, or rebuild cartilage, and did not have a reasonable basis to make the express claims that their TriFlex products will rebuild or regenerate cartilage.

34. Plaintiff has purchased TriFlex products on several occasions. In particular, he has purchased TriFlex Vitapak. Plaintiff purchased the TriFlex products from GNC stores in Florida, and he purchased the products for his own personal use.

35. The TriFlex products that Plaintiff purchased did not help repair or preserve his cartilage. Plaintiff's cartilage did not repair or preserve or regenerate as a result of his taking the TriFlex products.

## CLASS ACTION ALLEGATIONS

36. Plaintiff seeks to be appointed, under Rule 23(b)(3), as class representative of a

class composed of and defined as follows:

> All Florida residents who bought any TriFlex products in Florida since May 22, 2009, and did not resell them. Excluded from the Class are the Defendants and any Judge presiding over this matter and the members of his or her immediate family. Also excluded from this class are the legal representatives, heirs, successors and attorneys of any excluded person or entity, and any person acting on behalf of any excluded person or entity.

37. This action is appropriately suited for a class action. Plaintiff is informed, believes, and thereon alleges that the Class is sufficiently numerous, such that a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Florida purchasers of the TriFlex products is impractical.

38. This action involves questions of law and fact common to the Class. In marketing the TriFlex products, Defendants engaged in a systematic course of misrepresenting the products to Florida consumers. Such common issues of law and fact include but are not limited to:

- Whether the representation that TriFlex products help repair, regenerate, maintain, preserve, replace, renew, or rebuild cartilage was and is likely to mislead consumers;

- Whether failing to disclose that TriFlex products would not promote repair, regeneration, maintenance, preservation, replacement, renewal, or rebuilding of cartilage was likely to mislead consumers;

- Whether Defendants made false or misleading representations regarding the effectiveness of the TriFlex products;

- Whether Defendants represented that the TriFlex products have benefits which they do not have;

- Whether Defendants represented that the TriFlex products were of a particular standard or quality when they were not;

13

- Whether, as a result of Defendants' misconduct, the Class is entitled to equitable and injunctive relief;

- Whether the Class members obtained the benefit of their bargain in purchasing the TriFlex products;

- Whether, as a result of Defendants' misconduct, the Class is entitled to damages.

39. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and available remedies.

40. Plaintiff's claims are typical of the claims of members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff purchased TriFlex products, and suffered an injury-in-fact as a result of Defendants' conduct, as did all Class members. Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class. Plaintiff is represented by counsel who is competent and experienced in the prosecution of consumer class action litigation.

41. A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated purchasers of the TriFlex products to adjudicate simultaneously their common claims in a single forum in an efficient manner, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment also will permit the adjudication of relatively small claims by many members of the Class who could not afford individually to litigate the claims pleaded in this Complaint. There are no difficulties likely to be encountered in the management of this class action that would preclude its

maintenance as a class action.

## CAUSE OF ACTION
(Violations of Florida Deceptive and Unfair Trade
Practices Act, Fla. Stat. Sections 501.201 *et seq.*)

42. Plaintiff hereby realleges, and incorporates by reference as though set forth fully herein, the allegations contained in Paragraphs 1 through 41.

43. Section 501.204(1) of the Florida Statutes prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

44. Through their conduct described above, Defendants have engaged in unconscionable and deceptive acts and practices in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), the stated terms and intent of which is to protect consumers from unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

45. Representing that the TriFlex products help repair, regenerate, maintain, preserve, replace, renew, or rebuild cartilage is deceptive, and has the capacity, tendency and effect of deceiving reasonable consumers who purchase the products. Reasonable consumers would believe that the TriFlex products help repair, regenerate, maintain, preserve, replace, renew, or rebuild cartilage, based upon Defendants' misrepresentations to that effect.

46. Defendants knew, or should have known, that the representations that their

TriFlex products help repair, regenerate, maintain, preserve, replace, renew, or rebuild cartilage were untrue.

47.     Defendants made, and make, the representation that their TriFlex products help repair, regenerate, maintain, preserve, replace, renew, or rebuild cartilage and/or joints with the intent to induce consumers, and members of the class sought herein, to purchase the products by causing them to rely on the representation that the products will help repair, regenerate, maintain, preserve, replace, renew, or rebuild cartilage.

48.     Plaintiff and the Class have been aggrieved and have suffered losses as a result of the Defendants' violations of FDUTPA.  By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce, Plaintiff and the members of the Class have been substantially injured in the amount of the purchase prices for the TriFlex products that they paid, or, in the alternative, have been damaged by paying more for the TriFlex products that they purchased than for other products containing the same or similar ingredients that do not represent or promote that they will help repair, regenerate, maintain, preserve, replace, renew, or rebuild cartilage.

49.     Defendants continue to violate FDUTPA, and continue to aggrieve the members of the Class.

50.     By reason of the foregoing, Defendants have violated FDUTPA and are liable to Plaintiff and the Class for the damages that they have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, and attorneys' fees and costs. Plaintiff further demands injunctive relief enjoining Defendants from continuing to engage in,

use, or employ any act, including advertisements, packaging, or other representations, prohibited by FDUTPA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

1. Certifying this action as a class action as soon as practicable, with a class as defined above, designating Plaintiff as the named class representative, and designating the undersigned as Class Counsel;

2. On Plaintiff's Cause of Action, awarding against Defendants the damages that Plaintiff and the other members of the Class have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, statutory damages, and attorneys' fees and costs;

3. Awarding Plaintiff and the Class interest, costs and attorneys' fees;

4. Enjoining Defendants from continuing to engage in, use, or employ any act, including advertisements, packaging, or other representations, prohibited by FDUTPA; and

5. Awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiff hereby demands a trial by on all issues so triable.

Dated: May 22, 2013

                                  Respectfully Submitted,

                                  By: s/Kevin B. Love
                                  KEVIN B. LOVE
                                  Florida Bar No.: 993948
                                  **CRIDEN & LOVE, P.A.**
                                  7301 SW 57th Court, Suite 515
                                  South Miami, Florida  33143
                                  Telephone: (305) 357-9000
                                  Facsimile: (305) 357-9050
                                  klove@cridenlove.com

                                  Jeffrey I. Carton
                                  Robert J. Berg
                                  **DENLEA & CARTON LLP**
                                  One North Broadway
                                  Suite 509
                                  White Plains, N.Y. 10601
                                  Telephone: (914) 920-7400
                                  Facsimile:  (914) 761-1900
                                  jcarton@denleacarton.com
                                  rberg@denleacarton.com